IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03691-STV

**CASSANDRA CLEMONS**

        Plaintiff,

v.

**COLORADO DEPARTMENT OF REVENUE**

        Defendant.

---

### AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL

---

Plaintiff Cassandra Clemons (herein "Plaintiff" or "Ms. Clemons"), by her attorneys, files this Amended Complaint against the Colorado Department of Revenue (herein "Defendant" or "CDOR"). This Amended Complaint and Demand for Jury Trial removes two claims against Defendant, including discrimination and retaliation under 42 U.S.C. § 1981 and Breach of Contact, as follows:

## I.    <u>INTRODUCTION</u>

1.    This is a proceeding for a promotion, equal pay, damages and injunctive relief to redress the deprivation of rights secured to Plaintiff by the Equal Pay Act of 1963, as amended, 29 U.S.C. §§ 206(d), 215(a)(3) ("EPA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

## II.    <u>JURISDICTION</u>

2.      The jurisdiction of the Court over this controversy is invoked pursuant to the provisions of 28 U.S.C. § 1331, and specifically under the EPA and Title VII.

3.      Ms. Clemons timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 31, 2019, Charge No. 541-2019-01335 pursuant to Title VII to exhaust administrative remedies. Plaintiff received the Notice of Right to Sue on October 8, 2019. Ms. Clemons filed the initial Complaint and Demand For a Jury Trial on December 27, 2019.

### III.      VENUE

4.      Defendant CDOR resides in the State of Colorado and committed the unlawful employment practices alleged below.  Accordingly, venue lies in the United States District Court for the District of Colorado under 29 U.S.C. § 1391(b).

### IV.      PARTIES

5.      Plaintiff Cassandra Clemons is a resident of Montgomery County, Texas, with an address of 21615 Royal Melbourne Court, Porter, TX 77365.  Plaintiff is a person entitled to protection pursuant to the provisions of 42 U.S.C. § 2000e(f) and 29 U.S.C. § 203(e), and shall be treated as an employee within the meaning of the Equal Pay Act of 1963 and Title VII.

6.      Defendant CDOR is Plaintiff's employer within the State of Colorado. Defendant's address is 1375 Sherman St., Denver, CO 80261.

7.      Defendant was the "employer" of Plaintiff within the meaning of 42 U.S.C. § 2000e(b) at all times relevant to this action.

8.      Defendant was the "employer" of Plaintiff within the meaning of 29 U.S.C. §

203(d) of the Fair Labor Standards Act, of which the EPA is part, at all times relevant to this action.

## V.   GENERAL ALLEGATIONS

9.      The State of Colorado operates as the Colorado Department of Revenue.

10.     The Colorado Department of Revenue oversees several divisions, including the Taxation Division.

11.     The Taxation Division enforces the taxation laws and regulations of Colorado, including Colorado state tax filings and refunds for individuals and businesses with a presence in the State of Colorado.

12.     Ms. Clemons graduated with a Bachelor of Sciences in Business Administration in 2005.

13.     Ms. Clemons earned her Master's of Business Administration in 2008.

14.     Ms. Clemons has worked as a Field Auditor for state agencies since 2011.

15.     Prior to starting her employment with Defendant, Ms. Clemons worked as an Auditor for the State of Florida.

16.     Ms. Clemons is a black woman over the age of 40.

17.     Ms. Clemons began her employment with Defendant on April 1, 2015 as a Revenue Agent II.

18.     Defendant hired Ms. Clemons to work in the Field Audit section.

19.     Ms. Clemons is located in Houston, Texas.

20.     Ms. Clemons has worked in Houston, Texas her entire employment with Defendant.

21.    As of June 18, 2019, Defendant no longer provided a commercial location for its Houston Office.

22.    Since June 18, 2019, Houston Field Auditors are required to work out of their homes.

23.    When Ms. Clemons accepted the position as a Revenue Agent II, Defendant informed Ms. Clemons that the Taxation Division's typical practice was to promote employees after two years of employment.

24.    Ms. Clemons has observed this practice being applied to her non-black peers.

25.    Defendant has failed to promote Ms. Clemons since her April 1, 2015 hire.

26.    Ms. Clemons began the Revenue Agent II position with a monthly salary of $4,122.

27.    Ms. Clemons' starting annual salary was approximately $49,464.

28.    At the time of Ms. Clemons' April 1, 2015 hire, $4,122 was the minimum monthly salary permitted for a Revenue Agent II.

*Defendant Re-Classified its Employees in Department-Wide Reclassification*

29.    In 2016, Defendant re-classified the Revenue Agent positions from Revenue Agents to Auditors.

30.    Effective June 1, 2016, Defendant re-classified Ms. Clemons' position from Revenue Agent II to Auditor II.

31.    The department-wide re-classification did not significantly alter Ms. Clemons' auditing responsibilities.

*Defendant Began Discriminating Against Ms. Clemons After Mr. Hanson was Assigned as Her Manager*

32. On April 1, 2016, Marlan Hanson, a white male, became Ms. Clemons' manager.

33. Upon Mr. Hanson becoming Ms. Clemons' manager, Mr. Hanson changed the terms and conditions of Ms. Clemons' employment.

34. In 2016, Mr. Hanson informed Ms. Clemons that she was prohibited from completing audits outside of the 59-mile radius from the Houston office where she worked.

35. Prior to this restriction created by Mr. Hanson, Ms. Clemons was able to perform audits outside of that geographical limit.

36. The greater Houston area and surrounding cities, like Galveston, San Antonio and Austin, are outside of the 59-mile radius from the Houston office.

37. Non-black Auditors in the Field Audit section are permitted to conduct audits more than 59 miles from their office.

38. The 59-mile restriction on audits only applied to Ms. Clemons.

39. Prior to Mr. Hanson becoming Ms. Clemons' manager in 2016, Ms. Clemons was assigned the WFM audit that was located in Austin, Texas, which is outside the 59-mile radius from Ms. Clemons' office.

40. Defendant permitted Ms. Clemons' white male counterpart in the Houston office, Douglas Carpenter, to conduct audits more than 59-miles from the Houston office during his employment when Ms. Clemons was not permitted to do so.

41.     Defendant's policy is to provide the Field Auditors a monetary stipend for hotel, food, parking and mileage reimbursements when an audit is conducted further than 59 miles away.

42.     Defendant encourages Field Auditors to stay near an audit that is further than 59 miles from their respective office to preserve resources and reduce travel by staying close to the location of the audit.

43.     Ms. Clemons' non-black and/or male colleagues from Dallas, Texas and Fort Collins, Colorado have traveled to Houston, Texas and the surrounding areas to perform audits that Ms. Clemons was willing and able to complete.

44.     On February 20, 2018, Defendant sent an email to all Field Auditors with information about each Field Auditor's task list, which included completed and outstanding audits.

45.     The list emailed on February 20, 2018 indicated the location of the completed and outstanding audits for each Field Auditor.

46.     Ms. Clemons was the only out-of-state Field Auditor who did not complete audits outside of a 59-mile radius from her respective office.

47.     The information provided in the email indicated that Field Auditors in Dallas, Texas were performing audits within the greater Houston area, although Ms. Clemons was qualified and able to perform those Houston area audits.

48.     In January 2019, Ms. Clemons inquired about the continued prohibition on her ability to conduct audits outside of the 59-mile radius from her Houston office.

49.     The Field Audit section did not respond to Ms. Clemons inquiry.

50.     In addition to creating policies that only applied to Ms. Clemons, Mr. Hanson also did not provide the same level of support that he provided to Ms. Clemons' non-black peers, such as refusing to provide Ms. Clemons assistance when she experienced a new type of auditing issue or required assistance with a taxpayer question.

51.     After Mr. Hanson became Ms. Clemons' manager, Defendant also stopped including her on department-wide emails.

52.     The department-wide emails were sent from several divisions that provide information to employees about the operational decisions and changes, including employment benefit information.

53.     Defendant does not provide Ms. Clemons equal access to information that is sent to her non-black and/or male peers.

54.     The department-wide emails are important to Ms. Clemons because they contain information about her employment benefits and/or tasks.

55.     Defendant continues to exclude Ms. Clemons from department-wide emails.

56.     Since 2016, Defendant also began its pattern of excluding Ms. Clemons from the majority of the monthly manager meeting summaries that are sent to Auditors in the Field Audit section.

57.     The monthly manager summaries included information about policy changes, procedure changes, and new tax processes.

58.     The monthly manager summaries were important to Ms. Clemons' position because they contain information that impacts her job duties.

59.     Defendant's failure to provide Ms. Clemons up to date information denies her of knowledge regarding current divisional policies and procedures.

60.     Defendant provides the monthly manager summaries in a timely and consistent manner to Ms. Clemons' non-black and/or male peers.

61.     Ms. Clemons requested to be included on department-wide emails and the monthly manager summaries.

62.     Defendant did not respond or provide Ms. Clemons the requested communications.

*Defendant Denied Ms. Clemons' Request for a Salary Increase*

63.     On August 1, 2016, Ms. Clemons sent Defendant an email stating that her salary was lower than her Auditor II colleagues in the Field Audit section.

64.     Ms. Clemons requested a salary increase so that she would be compensated equally to her Auditor II peers in the Field Audit section.

65.     On October 13, 2016, Defendant, via Eric Johnson, former Tax Director, denied Ms. Clemons' request for a pay increase.

66.     On October 14, 2016, Ms. Clemons emailed Mr. Johnson regarding the publicly available data she reviewed.

67.     The data revealed that Ms. Clemons was the lowest compensated Auditor II in the Field Audit section.

68.     Ms. Clemons stated that Auditor II's with similar experience, skill, and education to herself were compensated with a monthly salary of $5,313.00.

69.     This was an annual salary of $63,756.00

70.     Ms. Clemons earned a monthly salary of $4,331.00.

71.     Ms. Clemons' annual salary was $51,972. 00.

72.     On October 18, 2016, Mr. Johnson responded that Defendant would not increase Ms. Clemons' salary to be equal to her similarly situated peers.

73.     Defendant did not adjust Ms. Clemons' salary.

*Defendant Manipulated Ms. Clemons' Access to the Defendant's Remote Network*

74.     In August 2016, Ms. Clemons began experiencing technical issues with her computer.

75.     As an out-of-state Auditor, Ms. Clemons' access to Defendant's internal network system was through a Virtual Private Network (VPN).

76.     Defendant's network system is only accessed by out-of-state Auditors through the VPN connection.

77.     During work hours, Ms. Clemons experienced delays several times each day due to VPN connection issues.

78.     Ms. Clemons' VPN connection was routinely disconnected.

79.     The VPN connection disruptions meant that Ms. Clemons was unable to access relevant systems and information to complete her tasks.

80.     Ms. Clemons lost significant portions of completed work when this occurred.

81.     During non-working hours, the same VPN connection issues did not occur.

82.     Ms. Clemons was forced to work outside of normal business hours to timely complete her tasks.

83.     Each time technical issues arose, Ms. Clemons sought assistance from the IT department.

84.     Ms. Clemons experienced the VPN connection issues through April 2018.

85.     Ms. Clemons did not experience similar technical issues from April 2018 until after she filed her Charge of Discrimination with the EEOC in February 2019.

*Mr. Hanson Intentionally Scored Ms. Clemons' Work Performance as Unsatisfactory*

86.     On October 6, 2017, Ms. Clemons attended her mid-year performance review for the 2017-2018 performance review period.

87.     Defendant's annual performance review period is April 1 until the following March 31 of each year.

88.     During that October 6, 2017 meeting, Mr. Hanson marked Ms. Clemons as "needs improvement" in the job performance factor, Quality of Work.

89.     Mr. Hanson stated that Ms. Clemons did not earn a sufficient amount of audit points during the performance period.

90.     Field Auditors have an annual goal for each performance period to earn 20 audit points.

91.     Audit points are earned based on the type and number of audits completed during the performance period.

92.     Mr. Hanson calculated that Ms. Clemons earned 11 points during the performance period.

93.     Ms. Clemons disagreed with Mr. Hanson's assessment of her work.

94.     On October 12, 2017, Ms. Clemons spoke to Mr. Hanson regarding the incorrect calculation.

95.     Mr. Hanson agreed to add one (1) more point to her earned audit points, bringing her total to 12 points.

96.     This amount did not accurately reflect Ms. Clemons' work.

97.     On October 12, 2017, Ms. Clemons submitted, via email, a complaint to Bharat Parmar, the Managing Director of the Field Audit Section.

98.     Ms. Clemons brought to Mr. Parmar's attention that Mr. Hanson had inaccurately calculated her earned audit points for audits completed in that performance period.

99.     The audit points Mr. Hanson calculated in her mid-year review were lower than the audit points Ms. Clemons had actually earned, causing her to incorrectly receive a "needs improvement" rating

100.    After a review of the information Ms. Clemons submitted regarding her actual earned audit points and Ms. Clemons' mid-year review, Mr. Parmar agreed that an increase to Ms. Clemons' audit points was justified based on her completed work.

101.    Ms. Clemons' mid-year review was amended to include Mr. Parmar's determination.

102.    Ms. Clemons earned a "satisfactory" rating for her performance.

103.    Per Mr. Parmar's review of Ms. Clemons' work performance, Defendant allocated 22.50 audit points to Ms. Clemons.

104.    Defendant only amended Ms. Clemons' performance review to accurately reflect her satisfactory performance after she brought it to management's attention that Mr. Hanson incorrectly calculated her performance.

105.    On May 31, 2018, Ms. Clemons received a successful rating at her annual 2017-2018 annual performance review.

*Defendant Denied Ms. Clemons' Request for a Salary Adjustment and Prohibited Her from Applying to an Open Auditor III Position*

106.    On January 23, 2018, Ms. Clemons requested a salary adjustment for a second time.

107.    She continued to be the lowest compensated Auditor II in the Field Audit section.

108.    Ms. Clemons' monthly salary was $4,400. 00.

109.    Ms. Clemons' annual salary was $52,800.00.

110.    In February 2018, Defendant posted a Promotion Ad for a Senior Auditor/Auditor III position within the Field Audit section.

111.    The February 2018 Auditor III Ad listed requirements including: an accounting degree; a Colorado Driver's license; and that if CPA certified, the certification had to be "licensure as a CPA from the Colorado Board of Accountancy."

112.    These were not typical requirements posted within Auditor III Ads.

113.    Defendant's February 2018 Auditor III Ad deterred Ms. Clemons from applying for the Auditor III position.

114.    Ms. Clemons does not have an accounting degree or a Colorado Driver's license, and she is not licensed with the Colorado Board of Accountancy.

115.    In March 2018, after the February 2018 Ad closed, Mr. Parmar stated that all employees were permitted to apply to the February 2018 Ad, including out-of-state employees without the Colorado specific requirements, despite explicit language requiring applicants to have a Colorado Driver's license and other Colorado specific requirements.

116.    Ms. Clemons was not informed of this prior to the February 2018 Auditor III Ad closing.

117.    The February 2018 Auditor III Ad did not include language that stated out-of-state Auditors were exempt from the Colorado specific requirements.

118.    On March 16, 2018, Ms. Clemons received notification from Mr. Parmar that her January 23, 2018 salary adjustment request was denied.

119.    Mr. Parmar stated that the best way to receive a pay increase is to "seek promotional opportunities."

*Defendant Promoted Ms. Clemons' Non-Black and/or Male Peers*

120.    Defendant did not promote Ms. Clemons or increase her salary so that she was paid equally to her similarly situated non-black and/or male peers in the Field Audit section.

121.    Ms. Clemons' starting monthly salary as an Auditor II was $4,122.00.

122.    Making her annual salary $49,464.00.

123.    Defendant promoted Ms. Clemons' non-black and/or male peers and paid them higher salaries for substantially similar work.

124.    Nehemiah Rodriguez is a non-black male who Defendant employs within the Field Audit section.

125.    Mr. Rodriguez graduated with his Bachelor's Degree in Accounting in May 2014. He performed his first auditing position with Defendant as a Revenue Agent Intern.

126.    Mr. Rodriguez began his employment with Defendant as a Revenue Agent Intern in November 2014.

127.    Mr. Rodriguez's starting monthly salary as a Revenue Agent Intern was $3,318.00.

128.    Mr. Rodriguez's starting annual salary was $39,816.00.

129.    Approximately one year later, in November 2015, Defendant promoted Mr. Rodriguez to Revenue Agent I.

130.    Defendant paid Mr. Rodriguez a starting monthly salary of $3,949.00 as a Revenue Agent I.

131.    Making his Revenue Agent I starting annual salary $47,388.00.

132.    Mr. Rodriguez's position was reclassified as an Auditor I position during the 2016 re-classification.

133.    Approximately one year after Mr. Rodriguez's promotion to Auditor I (f/k/a Revenue Agent I), Defendant promoted Mr. Rodriguez to Auditor II in November 2016.

134.    Mr. Rodriquez's starting monthly salary as an Auditor II was $4,431.00.

135.    Mr. Rodriquez's Auditor II starting annual salary was $53,172.00.

136.    After two years of auditing experience, Mr. Rodriguez earned a greater salary than Ms. Clemons.

137.    In July 2018, Defendant promoted Mr. Rodriguez to Auditor III.

138.    Mr. Rodriguez's starting monthly salary as an Auditor III was $5,218.00.

139.    Mr. Rodriguez's Auditor III starting annual salary was $62,616.00.

140.    After approximately three and a half years of auditing experience, Defendant promoted Mr. Rodriquez three times.

141.     This is Defendant's pattern and practice of promoting its non-black and/or male Auditors.

142.    Nanette Spaedt is a non-black female who Defendant employs within the Field Audit section.

143.    Ms. Spaedt graduated with her Bachelor's Degree in Accounting. She performed her first auditing position with Defendant as a Revenue Agent Intern.

144.    Ms. Spaedt began her employment with Defendant as a Revenue Agent Intern in November 2014.

145.    Ms. Spaedt's starting monthly salary as a Revenue Agent Intern was $3,318.00.

146.    Ms. Spaedt's starting annual salary was $39,816.00.

147.    Approximately one year later, in November 2015, Defendant promoted Ms. Spaedt to Revenue Agent I.

148.   Defendant paid Ms. Spaedt a starting monthly salary of $3,949.00 as a Revenue Agent I

149.   Ms. Spaedt's Revenue Agent I starting annual salary was $47,388.

150.   Ms. Spaedt's position was reclassified as an Auditor I position during the 2016 re-classification.

151.   Approximately one year after Ms. Spaedt's promotion to Auditor I (f/k/a Tax Revenue Agent I), Defendant promoted Ms. Spaedt to Auditor II in November 2016.

152.   Ms. Spaedt's starting monthly salary as an Auditor II was $4,431.00.

153.   Ms. Spaedt's Auditor II starting annual salary was $53,172.00.

154.   After two years of auditing experience, Ms. Spaedt earned a greater salary than Ms. Clemons.

155.   In July 2018, Defendant promoted Ms. Spaedt to Auditor III.

156.   Ms. Spaedt's starting monthly salary as an Auditor III was $5,218.00.

157.   Ms. Spaedt's Auditor III starting annual salary was $62,616.00.

158.   After approximately three and a half years of auditing experience and employment with Defendant, Defendant promoted Ms. Spaedt three times.

159.   Edward Moore is a non-black male who Defendant employs within the Field Audit section.

160.   Mr. Moore began his auditing career when he became a Revenue Agent Intern in December 2010.

161.   Mr. Moore's starting monthly salary as a Revenue Agent Intern was $3,366.00.

162.   Mr. Moore's annual salary was $40,392.00.

163.   Approximately one year later, Defendant promoted Mr. Moore to the Revenue Agent I position.

164.   Mr. Moore's starting monthly salary as a Revenue Agent I was $3,895.00.

165.   Mr. Moore's starting annual salary was $46,740.00.

166.   In early 2013, Defendant promoted Mr. Moore to the Revenue Agent II position.

167.   Mr. Moore's starting monthly salary as a Revenue Agent II was $4,508.00.

168.   Mr. Moore's starting annual salary was $54,096.00.

169.   In February 2016, Defendant promoted Mr. Moore to the Revenue Agent III position.

170.   Mr. Moore's starting monthly salary as a Revenue Agent III was $5,414.00.

171.   Mr. Moore's annual salary was $64,968.00.

172.   Mr. Moore's position was reclassified as an Auditor III position during the 2016 re-classification.

173.   Defendant hired Mr. Rodriguez, Ms. Spaedt, and Mr. Moore as Interns in the Field Audit section because they lacked auditing experience.

174.   Each of them was promoted above Ms. Clemons to an Auditor III.

175.   Ms. Clemons has similar or more auditing experience than Mr. Rodriguez, Ms. Spaedt, and Mr. Moore.

Case 1:19-cv-03691-WJM-STV   Document 19   Filed 02/10/20   USDC Colorado   Page 18 of 36

176.   Defendant has intentionally discriminated against Ms. Clemons by its unlawful promotion practices.

177.   Ms. Clemons has remained in the same position her entire Colorado Department of Revenue career.

178.   Defendant's failure to equally pay and promote Ms. Clemons is due to her gender, race, and/or color.

179.   Effective April 2, 2018, Tom Schade became Ms. Clemons' new immediate manager.

*Defendant Refused to Promote Ms. Clemons to an Auditor III*

180.   On June 6, 2018, Defendant published six Ads for six Senior Auditor/Auditor III positions within the Field Audit section.

181.   The Ad was open to classified permanent employees.

182.   Ms. Clemons was a classified permanent employee on June 6, 2018.

183.   The June 6, 2018 Ad did not include the accounting degree requirement or the Colorado specific requirements outlined in the February 2018 Ad for an Auditor III position.

184.   On June 7, 2018, Ms. Clemons applied for one of the open six Senior Auditor/Auditor III positions.

185.   On June 11, 2018, Defendant responded that Ms. Clemons could not apply for the Auditor III position.

186.   Ms. Clemons complained of Defendant's statement that she could not apply for the Auditor III position.

187.    On June 11, 2018, after she complained, Defendant sent Ms. Clemons an email stating it reversed its decision.

188.    Defendant stated that Ms. Clemons' application would be considered for the open Auditor III.

189.    On June 13, 2018, Defendant sent Ms. Clemons a final decision that she was denied the Auditor III position.

190.    Defendant, via email, admitted on June 13, 2018 that Ms. Clemons met the minimum qualifications of the open Auditor III position.

191.    On June 14, 2018, Defendant notified Ms. Clemons that she was being considered for the open Auditor III position.

192.    Ms. Clemons' Appointing Authority, Chris Muntean, was copied on her communications with Human Resources.

193.    Mr. Muntean took no action to resolve or prevent Defendant's discriminatory exclusion of Ms. Clemons from the interview process for the Auditor III promotion.

194.    On June 20, 2018, Defendant invited Ms. Clemons to interview for the open Auditor III position.

195.     On Friday, June 28, 2018, Defendant interviewed Ms. Clemons for the Auditor III position.

196.    Defendant required Ms. Clemons to present a 10-minute PowerPoint presentation.

197.    The interview also included a panel of three managers.

198.   The three non-black managers included Bharat Parmar, Managing Director of the Field Audit Division; Heather Mortiz, former QA Manager; and Brenda Petersen, former Mineral Audit Manager.

199.   During the entire interview, the panel was not engaged and did not appear interested in interviewing Ms. Clemons.

200.   For example, Ms. Mortiz interrupted Ms. Clemons while Ms. Clemons answered interview questions.

201.   Ms. Mortiz would either cut off or speak over Ms. Clemons.

202.   Internal candidates are not typically required to do a 10-minute PowerPoint presentation.

203.   Internal candidates are not required to interview in front of a panel of three managers.

204.   On July 3, 2018, Defendant notified Ms. Clemons that she was not chosen for the promotion.

205.   Defendant placed less experienced, male and/or non-black employees in the Auditor III positions.

*Defendant Retaliated Against Ms. Clemons After She Engaged in Protected Activity*

206.   On July 11, 2018, Ms. Clemons engaged in protected activity when she filed a State Personnel Board (SPB) appeal regarding Defendant's failure to promote her to the Auditor III position which referenced discrimination.

207.   Two days later, Defendant sent Ms. Clemons a Flexible Work Arrangement Agreement altering her work schedule.

208.    During her employment prior to July 11, 2018, Defendant permitted Ms. Clemons to work from home two days per week.

209.    The new Flexible Work Arrangement Agreement limited Ms. Clemons' ability to work from home after Ms. Clemons appealed her failure to be promoted.

210.    On July 16, 2018, Ms. Clemons retuned a signed copy of the Flexible Work Arrangement Agreement along with a letter outlining her concerns of the change and her belief that it was retaliatory for filing a SPB appeal.

211.    No investigation was conducted into her complaints of retaliation.

212.    The SPB appeal requires that each party submit mandatory disclosures.

213.    Mandatory disclosures must include all documents and information relied upon by Defendant when reaching the agency's decision on appeal, which was Ms. Clemons' failure to promote claim.

214.    Defendant did not produce the matrix chart and interview notes of Ms. Clemons' interview or those of other candidates chosen for the Auditor III positions.

215.    On July 17, 2018, Mr. Schade, Ms. Clemons' manager, called Ms. Clemons to inform her that he was visiting the Houston office that next week on Wednesday, July 25, 2018.

216.    Mr. Schade stated that he would meet with Ms. Clemons at 10:00 a.m. on July 25, 2018.

217.    The short notice of his arrival was unusual.

218.    In the past, when a manager visited the Houston office, it was announced weeks in advance.

219.    A Houston office manager had also never visited the Houston office during July.

220.    Typically, the manager of the Houston office, who resides in Colorado, visits around the time of the mid-year and annual performance reviews that occur in October and April of each year.

221.    Mr. Schade did not inform Ms. Clemons in advance of the purpose of his sudden trip.

222.    Mr. Schade did not inform Ms. Clemons in advance of the purpose of the July 25, 2018 in-person meeting.

223.    The July 25, 2018 meeting did not have a work-related purpose or agenda.

224.    Mr. Schade began the meeting by asking Ms. Clemons what she wanted to talk about.

225.    Mr. Schade then began a line of questions that was atypical for this point in her career.

226.    He asked Ms. Clemons where she went to college.

227.    Mr. Schade appeared very interested in the timeline of Ms. Clemons' pending SBP appeal.

228.    He wanted to know where she was in the SPB process and how long she expected the SPB appeal to take.

229.    Mr. Schade also asked Ms. Clemons the name of the law firm that she hired to represent her through her pending SPB appeal.

230.    The questions caused Ms. Clemons to become uncomfortable.

231.    Ms. Clemons asked Mr. Schade when the opportunity for a promotion to an Auditor III position would occur.

232.    Ms. Clemons indicated that she wanted to be promoted to an Auditor III.

233.    Mr. Schade did not provide any answers on when Ms. Clemons would finally be promoted into an Auditor III position.

*The State Personnel Board Recommended an Investigation into CDOR's Selection for the Auditor III Position*

234.    On October 17, 2018, the State Personnel Board Administrative Law Judge, Susan Tyburski, issued a Preliminary Recommendation. The Preliminary Recommendation recommended a review of Defendant's selection process for the June 2018 Auditor III position by the State Personnel Director.

235.    Judge Tyburski determined that evidence provided during the SPB appeal raised questions about whether CDOR followed an appropriate process in making its selection for the June 2018 Auditor III position.

236.    That issue was within the jurisdiction of the State Personnel Director and therefore Judge Tyburski, as part of the Preliminary Recommendation, suggested the matter be referred to the State Personnel Board Director for review of the selection process for the Auditor III position.

237.    On November 20, 2018, the State Personnel Board adopted the October 17, 2018 Preliminary Recommendation and thereby referred the issue regarding CDOR's selection process for the Auditor III position to the State Personnel Director for review.

238.    Pursuant to C.R.S § 24-50-112.5, "the State Personnel Director shall establish procedures and directive necessary to implement a merit-based statewide selection system to be used uniformly by all principal departments." Additionally, it provides that promotions must be fair and selection must be made without regard to the applicant's protected classes, including race, color, sex, and age.

239.    The State Personnel Director also has jurisdiction over appeals made by individuals directly affected by the selection and comparative analysis process.

240.    The State Personnel Director, under C.R.S § 24-50-112.5(4)(a)-(b) must review the appeal.

241.    The State Personnel Director, June Taylor, declined to review Ms. Clemons' appeal.

242.    She alleged no jurisdiction over the matter and dismissed the appeal.

243.    C.R.S § 24-50-112.5 clearly states that the State Personnel Director has jurisdiction over such matters and was required to investigate the agency's decision and determine whether it was arbitrary, capricious, or contrary to rule or law.

244.    No such investigation occurred.

245.    As a result, Defendant's unfair and discriminatory practices that are the cause of its refusal to promote Ms. Clemons have not been investigated. Defendant also had knowledge of this information and took no action itself to look into discriminatory complaints made by Ms. Clemons.

246.    Ms. Clemons did not receive a copy of the State Personnel's Director's dismissal until February 21, 2019, after the deadline to further appeal the decision.

247.    Therefore, Ms. Clemons was barred from further pursuing the issue related to CDOR's selection process for the June 2018 Auditor III position.

*Douglas Carpenter Resigned from his Employment*

248.    In February 2019, Ms. Clemons' Houston counterpart, Douglas Carpenter, resigned from his Auditor III position.

249.    No Ad was posted advertising the open Auditor III position.

250.    Defendant decision to not post an Ad for the open Auditor III position denied Ms. Clemons the opportunity to apply for the open Auditor III position.

251.    Ms. Clemons conducted audits at the same level as Mr. Carpenter.

252.    Ms. Clemons was qualified for the Auditor III position when it became open in February 2019.

*Defendant Retaliated Against Ms. Clemons For Engaging in Protected Activity*

253.    On April 5, 2019, Defendant submitted its Position Statement to the EEOC in response to Ms. Clemons' January 2019 Charge of Discrimination.

254.    On April 17, 2019, Mr. Schade provided Ms. Clemons with her 2018-2019 performance review.

255.    Ms. Clemons received an overall successful rating.

256.    Mr. Schade sent Ms. Clemons the review by email.

257.    No meeting or discussion occurred regarding her 2018-2019 performance and ratings provided in the performance review.

258.    This was contrary to Defendant's typical practice.

259.    In prior years, Ms. Clemons' manager traveled to Houston to conduct the annual performance review and provide feedback.

260.    Mr. Schade provided no performance feedback.

261.    On April 17, 2019, Ms. Clemons began experiencing technical issues with her computer and VPN connection.

262.    Ms. Clemons was unable to log into CDOR's system.

263.    The technical issues meant that Ms. Clemons did not have access to the remote network or audit software to perform many of her job functions.

264.    Ms. Clemons informed management regarding her technical issues.

265.    Ms. Clemons asked for assistance and it was not received.

266.    Ms. Clemons did not have computer access for approximately 30 days.

267.    The delay interfered with her work productivity.

268.    Ms. Clemons had auditing deadlines approaching on June 30, 2019.

269.    Ms. Clemons' access was restored on May 21, 2019.

270.    She continued to experience technical issues despite using a new computer.

271.    Ms. Clemons was required to work long hours and during non-working hours to timely meet her June 30, 2019 deadlines.

272.    Ms. Clemons' connectivity issues continued after May 2019.

273.    Similar technical issues caused Ms. Clemons to work long hours leading up to September 30, 2019 and November 29, 2019 deadlines.

*Defendant Issued a Performance Improvement Plan Against Ms. Clemons*

274.    On September 18, 2019, Defendant emailed Ms. Clemons a Notice of Performance Improvement Plan dated September 16, 2019.

275.    Prior to the Performance Improvement Plan (PIP), Defendant did not address performance issues with Ms. Clemons or a potential PIP.

276.    The PIP was effective until December 31, 2019.

277.    The deadlines provided within the PIP ended on October 15, 2019.

278.    No reason or goals were provided to explain why the PIP extended past the deadlines provided within the notice.

279.    Defendant alleged the purpose of the PIP was to provide "a framework needed to help [Ms. Clemons] succeed in [her] position as an Auditor II."

280.    The PIP required Ms. Clemons to fulfill "two actions" which included: "1. You will submit the corrected audit file for [CS] by September 30, 2019. 2. You will submit the audit file for [WFM] and its related companies by October 15, 2019."

281.    Defendant was aware that Ms. Clemons had already submitted the CS audit on August 31, 2019.

282.    The CS audit had previously approved a waiver deadline of September 30, 2019.

283.    Ms. Clemons was on track to submit the corrected CS audit by the previously approved waiver deadline.

284.    Ms. Clemons submitted the corrected CS audit per the previously approved waiver deadline of September 30, 2019.

285.    The inclusion of the CS audit was retaliatory.

286.   Ms. Clemons was meeting her waiver deadlines.

287.   The PIP required that Ms. Clemons submit the WFM audit by October 15, 2019.

288.   The previously approved waiver deadline for the completion of the WFM audit was November 29, 2019.

289.   The October 15, 2019 deadline was approximately 45 days prior to the November 29, 2019 approved waiver deadline.

290.   The PIP did not consider a practice regularly used by Field Auditors.

291.   Defendant permitted Field Auditors to use a 'Yellow Folder' submission within the 45-day window leading up to the waiver deadline.

292.   Ms. Clemons had used 'Yellow Folder' submissions in the past with no issue.

293.   Ms. Clemons informed her manager on several occasions that she required the entire approved waiver deadline period to properly complete the audit.

294.   Ms. Clemons' need for the waiver period was consistent with the pattern and practice permitted for Field Auditors.

295.   The PIP also alleged that Ms. Clemons' "behavior does not meet the needs of [CDOR's] clients or business operations."

296.   Defendant received no taxpayer complaints regarding the timeliness of the CS and WFM audits.

297.   Ms. Clemons engaged in typical business operations.

298. Typically, when a PIP is issued, the employee's manager discusses the PIP and provides an opportunity to ask questions about meeting the expectations under the PIP.

299. When Defendant provided Ms. Clemons a copy of the PIP on Wednesday, September 18, 2019, no discussion or meeting occurred.

300. Ms. Clemons attempted to discuss the terms of the PIP.

301. Defendant did not discuss the PIP with Ms. Clemons until September 27, 2019.

302. The September 27, 2019 conversation did not provide information to Ms. Clemons on how to meet the October 15, 2019 deadline.

303. Ms. Clemons submitted the WFM audit prior to the November 29, 2019 waiver deadline.

304. Ms. Clemons filed another Charge of Discrimination for retaliation with the EEOC on October 11, 2019.

305. Ms. Clemons also initiated the internal grievance process regarding the September 2019 PIP.

306. During the internal grievance process, Defendant refused to revoke Ms. Clemons' September 2019 PIP or take any other action to reverse the discriminatory and retaliatory actions against Ms. Clemons.

307. The agency's final decision regarding upholding the PIP was issued on November 20, 2019.

308.    Thereafter, Ms. Clemons also filed a Charge of Discrimination for retaliation with the Colorado Civil Rights Division on December 26, 2019 as part of the State Personnel Board appeal process.

### VI.    FIRST CLAIM FOR RELIEF
**Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), as amended**
**Sex-Based Wage Discrimination**

309.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 308 above, as if fully set forth herein.

310.    Plaintiff performed work that was substantially equal to that of male Field Auditors employed by Defendant considering the skills, duties, supervision, effort, and responsibilities of the position.

311.    Ms. Clemons held a job title with a job description and official responsibilities that were substantially equal, if not the same, to that of her male counterparts.

312.    Ms. Clemons performed these responsibilities in conditions where the work performed by her and the male Field Auditors was basically the same.

313.    Ms. Clemons' male counterparts were paid more under these circumstances, in violation of the federal Equal Pay Act.

314.    Defendant's violation of the Equal Pay Act was willful and caused Plaintiff economic loss.

### VII.    SECOND CLAIM FOR RELIEF
**Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1), as amended**
**Sex-Based Wage Retaliation**

315.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 314 above, as if fully set forth herein.

316.    Plaintiff engaged in protected activity under the Equal Pay Act. She requested to be paid equally to her male counterparts including, but not limited to, complaining to management, filing an appeal with the State Personnel Board, and filing a Charge of Discrimination with the Equal Employment Opportunity Commission.

317.    After Ms. Clemons objected to Defendant's unfair practices under the Equal Pay Act, Defendant subjected Ms. Clemons to adverse treatment including, but not limited to, requiring her to work in a hostile work environment which materially and adversely affected the terms and conditions of her employment, subjecting her to disparate treatment because of her protected activity, subjecting her to efforts to adversely affect the terms and conditions of her employment, failing to promote her, and other discriminatory practices.

318.    As a direct and proximate result of Defendant's actions, Plaintiff is prohibited from enjoying the full terms of and conditions of her employment.

319.    Defendant's violation of the Equal Pay Act was willful and caused Plaintiff economic loss.

### VIII.    THIRD CLAIM FOR RELIEF
**Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e, *et seq.*
Discrimination and Failure to Promote**

320.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 319 above, as if fully set forth herein.

321.    As a black woman, Ms. Clemons is a member of multiple protected classes.

322.    Defendant treated Ms. Clemons less favorably than her similarly situated non-black and/or male counterparts.

323.    Defendant subjected Ms. Clemons to adverse treatment in the terms and conditions of her employment because of her gender, race, and/or color including, but not limited to, denial of promotions and discriminatory terms and conditions of employment.

324.    At all pertinent times, Ms. Clemons performed the functions of her job competently and was more than qualified for promotions.

325.    Despite her superior qualifications and successful job performance, Defendant refused to promote Ms. Clemons, in whole or in part, because of her gender, race, and/or color. Instead, Defendant promoted non-black and/or males into the positions for which Ms. Clemons was qualified.

326.    Ms. Clemons' gender, race and/or color was a motivating factor in Defendant's failure to promote Ms. Clemons. Defendant's asserted reasons for failing to promote Ms. Clemons were mere pretext for illegal discrimination.

327.    Defendant is liable for the acts and/or omissions of its agents and employees. Defendant, either directly or by and through its agents, discriminated against Plaintiff on the basis of her gender, race, and/or color and directly and proximately caused her severe injuries, economic and non-economic damages, including emotional distress, and losses.

328.    Defendant's acts and conduct were committed with malice or with reckless indifference to Ms. Clemons' federally protected rights within the meaning of Title VII.

329.    The unlawful employment practices complained of above were and are intentional.

## IX.    FOURTH CLAIM FOR RELIEF
### Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e, *et seq.*
### Retaliation

330.    Plaintiff incorporates by reference and realleges each and every allegation contained in paragraphs 1 through 329 above, as if fully set forth herein.

331.    Ms. Clemons believes in good faith that Defendant discriminated against her on the basis of her gender, race, and/or color, as described herein.

332.    Ms. Clemons opposed Defendant's discriminatory treatment by reporting it to Defendant, filing an appeal with the State Personnel Board, and filing her Charges of Discrimination with the EEOC and CCRD.

333.    As a direct result of Ms. Clemons' opposition to activities prohibited by Title VII, Defendant subjected Ms. Clemons to adverse treatment including, but not limited to, requiring her to work in a hostile work environment which materially and adversely affected the terms and conditions of her employment, subjecting her to disparate treatment because of her gender, race and/or color, subjecting her to efforts to adversely affect the terms and conditions of her employment, failing to promote her, and other discriminatory practices.

334.    Defendant's retaliation against Ms. Clemons arose out of, and was like and related to, the discrimination Ms. Clemons opposed during her employment, both to management, the State Personnel Board, and the EEOC.

335.    Defendant is liable for the acts and omissions of its agents and employees.  Defendant, either directly or by and through its agents, retaliated against Ms. Clemons and directly and proximately caused her severe injuries, economic and non-economic damages, including emotional distress, and losses.

336.    Defendant's conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiff within the meaning of Title VII.

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

A.    A permanent injunction enjoining Defendant, its management personnel, employees, agents, successors, assigns, and all other persons in active concert or participation with them, from engaging in any employment practice which discriminates on the basis of gender, color, and race;

B.    An Order requiring Defendant to institute and carry out policies, practices, and programs which provide equal employment opportunities to female and black employees and which eradicate the effects of past and present unlawful employment practices;

C.    An Order requiring Defendant to make whole Plaintiff by providing her with appropriate lost earnings and benefits, and other economic loss, with pre-judgment interest, in amounts to be proved at trial, and other affirmative relief necessary to

eradicate the effects of its unlawful employment practices including, but not limited to, increasing Plaintiff's pay in accordance to her male peers.

D.      That this Court retain jurisdiction over this action until Defendant has fully complied with the orders of this Court, and that this Court require Defendant to file any and all reports necessary and to supervise compliance with law that any and all matters related hereto be done in conformance with the applicable EPA and Title VII provisions;

E.      For lost monies and damages pertaining to out-of-pocket expenses;

F.      An Order requiring Defendant to make whole Plaintiff by providing compensation for non-pecuniary losses, including emotional pain, suffering, inconvenience and mental anguish in amounts to be proven at trial;

G.      Such further relief as the Court deems just, necessary and proper;

H.      Pre-and-post-judgment interest; and

I.      Costs and attorneys' fees incurred in this action.

## JURY TRIAL DEMAND

The Plaintiff hereby requests a jury trial on all questions of fact raised by this Complaint.

Respectfully submitted this 10th day of February, 2020.

TRUHLAR and TRUHLAR, L.L.P.

*/s Kaitlin I. Spittell*
Kaitlin I. Spittell
Robert J. Truhlar
7340 E. Caley Avenue, Suite 310
Centennial, CO 80111

Phone: 303-794-2404
Fax: 303-794-1142
Email: roberttruhlar@att.net
Email: kspittell.truhlar@gmail.com
Attorneys for Plaintiff

**PLAINTIFF'S ADDRESS**:

21615 Royal Melbourne Court
Porter, TX 77365